# EXHIBIT A

D.C. Courts Home

# Court Cases Online

Click here to view search criteria

Case Search for Company: NOBLE SYSTEMS

Search retrieved 1 case in 2.12 seconds.

Click here to view search results

Selected 1 cases to view

Viewing single case; Details retrieved in less than a second.

Click here to view case summary

| 2013 CA 005424 B: BPO SOLUTIONS, INC. Vs. NOBLE SYSTEMS CORPORATION | |
|---|---|
| Case Type: Civil II | File Date: 08/07/2013 |
| Status: Open | Status Date: 08/07/2013 |
| Disposition: Undisposed | Disposition Date: |

| Party Name | Party Alias(es) | Party Type | Attorney(s) |
|---|---|---|---|
| BPO SOLUTIONS, INC. | | PLAINTIFF | PERRY, CAROL J. |
| NOBLE SYSTEMS CORPORATION | | Defendant | FINLEY, TILLMAN J |

| Schedule Date | Schedule Time | Description |
|---|---|---|
| 11/08/2013 | 09:30 AM | Initial Scheduling Conference-60 |

| Docket Date | Description | Messages |
|---|---|---|
| 08/28/2013 | Praecipe to Extend Time Filed | Praecipe to Extend Time for Defendant to Respond. Filed. Submitted. 08/28/2013 10:45. ncv. Attorney: FINLEY, TILLMAN J (477737) NOBLE SYSTEMS CORPORATION (Defendant); |
| 08/26/2013 | Praecipe to Enter Appearance Filed | Praecipe to Enter Appearance of Tillman J. Finley as Counsel for the Defendant. Filed. Submitted. 08/26/2013 11:36. ncv. Attorney: FINLEY, TILLMAN J (477737) NOBLE SYSTEMS CORPORATION (Defendant); |
| 08/14/2013 | Proof of Service | Proof of Service Method : Service Issued Issued : 08/08/2013 Service : Summons Issued Served : 08/13/2013 Return : 08/14/2013 On : NOBLE SYSTEMS CORPORATION Signed By : Jeremy Littlefield<br><br>Reason : Proof of Service Comment :<br><br>Tracking #: 5000136851 |
| 08/14/2013 | Notice of Acknowledgment of Service Filed | Notice of Acknowledgment of Service. Filed. Submitted. 08/14/2013 15:57. ncv. NOBLE SYSTEMS CORPORATION (Defendant); |
| 08/08/2013 | Service Issued | Issue Date: Service: Summons Issued Method: Service Issued Cost Per: $<br><br>NOBLE SYSTEMS CORPORATION 4151 Ashford Dunwoody Road N.E., Suite600 ATLANTA, GA 30319 Tracking No: 5000136851 |
| 08/07/2013 | Event Scheduled | Event Scheduled Event: Initial Scheduling Conference-60 Date: 11/08/2013 Time: 9:30 am Judge: MOTLEY, THOMAS J Location: Courtroom 212 |
| 08/07/2013 | Complaint for Breach of Contract Filed | Complaint for Breach of Contract Filed. Attorney: PRO SE (999999) BPO SOLUTIONS, INC (PLAINTIFF); Receipt: 259758 Date: 08/07/2013 |

| Receipt # | Date | From | Payments | | Fee | | Amount Paid |
|-----------|------|------|----------|---|-----|---|-------------|
| 259758 | 08/07/2013 | PERRY, CAROL J. | Check | $120.00 | Cost | $120.00 | $120.00 |

RECEIVED
Civil Clerk's Office

AUG 0 7 2013

Superior Court of the
District of Columbia
Washington, D.C.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

BPO SOLUTIONS, INC.,

      Plaintiff,

    v.

NOBLE SYSTEMS CORPORATION,

      Defendant.

Civil Action No. **13- 0 0 0 5 4 2 4**

## COMPLAINT

This is an action for tortious interference with contractual relations and tortious interference with business relations. Plaintiff seeks monetary damages.

### PARTIES AND JURISDICTION

1.    Plaintiff BPO Solutions, Inc. ("BPO Solutions") is a Delaware corporation with its principal place of business at 1700 Pennsylvania Avenue, Suite 560, Washington, D.C. 20006.

2.    Defendant Noble Systems Corporation ("Noble") is a Georgia corporation with its principal place of business at 4151 Ashford Dunwoody Road NE, Suite 600, Atlanta, Georgia 30319.

3.    This court has jurisdiction over this action and the parties pursuant to D.C. Code §§ 11-921 and 13-423.

## FACTUAL ALLEGATIONS

### BPO Solutions's Contract with Faisal Mehmood

4.      Plaintiff BPO Solutions contracts with dozens of software developers in Pakistan to develop and market proprietary contact center technology to customers. Contact centers are commonly known as "call centers."

5.      Plaintiff derives significant value from the development and protection of its confidential and proprietary information, much of which is shared with these developers in connection with their work for Plaintiff. To protect the confidentiality of this information, Plaintiff requires its developers to execute a written consulting services contract that includes industry-standard non-disclosure and non-compete covenants ("Services Agreement").

6.      Plaintiff hired Faisal Mehmood as a Principal Software Consultant on July 1, 2012. In consideration for Mr. Mehmood's consulting relationship, Plaintiff and Mr. Mehmood signed a Services Agreement containing the industry-standard non-disclosure and non-compete covenants. This Services Agreement expired on October 31, 2012.

7.      Plaintiff and Mr. Mehmood continued the relationship pursuant to a follow-on Services Agreement, signed on November 1, 2012 and amended on January 31, 2013. The second Services Agreement also contained the industry-standard non-disclosure and non-compete covenants. The second Services Agreement expired on July 31, 2013. Plaintiff expected to continue Mr. Mehmood's consulting relationship by executing another follow-on Services Agreement on or after August 1, 2013.

8.      Plaintiff's Services Agreements with Mr. Mehmood are attached to the Complaint as Exhibit A. Each Services Agreement contains an industry-standard non-disclosure covenant, which states:

2

Non-disclosure. During the term of Contractor's consultancy with the Company, Company may disclose to the Contractor Confidential Information as appropriate or necessary for Contractor to perform its consulting duties, and Contractor will generate and contribute to Confidential Information in connection with Contractor's duties. The Contractor hereby covenants and agrees that it will not, during the term of Contractor's consultancy with Company and for the maximum period thereafter as permitted by law, disclose to any person, or use, any Confidential Information except as required in the course of Contractor's consultancy with the Company or otherwise with Company's prior written consent. Contractor shall use its best efforts to prevent accidental or negligent loss or release of Confidential Information to any unauthorized persons or entities and will immediately notify Company if any such loss or release occurs.

Services Agreement, ¶ 2.1.

9.      "Confidential Information" is defined in each Services Agreement as:

[A]ll information of any nature in any form, whether disclosed in writing, orally, or electronically, that is disclosed to or known by the Contractor as a consequence of or through its consulting relationship with the Company, whether such information is developed by Contractor or is submitted to the Company or its Affiliates in confidence by third parties. Confidential Information will include, without limitation, all writings, memoranda, copies, reports, records, papers, surveys, analyses, drawings, letters, computer printouts, computer programs (source and object code), computer applications, computer processing techniques, methodologies, proposals, bids, processes, specifications, customer data (such as customer lists, identities, and requirements), contacts, licenses, business methods, business processes, business techniques, business plans, financial records, employee compensation, marketing plans, data, graphs, charts, sound recordings, pictorial representations, inventions, prototypes, and samples (whether or not patentable or copyrightable). Confidential Information does not include information that was (i) part of the public domain at the time of disclosure to Contractor or becomes part of the public domain, other than by a Contractor's breach of an obligation to maintain confidentiality; (ii) acquired by Contractor from a third party without an obligation of confidentiality; or (iii) approved for public release in writing by the Company.

Services Agreement, ¶ 1.2.

3

10.     Each Services Agreement also contains an industry-standard non-compete

covenant, which states:

> Non-Compete.  Contractor agrees that during the term of his
> consultancy, and for a twelve-month period following termination
> of such consultancy for any reason, Contractor will not directly or
> indirectly (including without limitation as an individual, officer,
> director, proprietor, employee, partner, member, creditor,
> consultant, advisor, sales representative, agent, or investor of more
> than five percent (5%) of the issued equity of a corporate entity),
> engage, anywhere in the Restricted Area (as defined below), in a
> Restricted Business (as defined below).
>
>> "Restricted Area" means Pakistan and those geographic
>> areas into which the Company provides goods or services.
>>
>> "Restricted Business" means any venture, enterprise,
>> activity or business engaged in a business, directly or
>> indirectly, similar to the actual or prospective business of
>> Company, including without limitation, any business who
>> provides in, to, or from the Restricted Area, dialer services,
>> software or hardware.

Services Agreement, ¶ 5.3.

11.     During his relationship with Plaintiff, Mr. Mehmood had access to and obtained

Plaintiff's confidential information, as defined in the Services Agreement, including but not

limited to the source code for its proprietary technology software (including the source code for

products of Plaintiff's affiliates), customer and prospective customer identities, market strategies,

product development and performance specifics, business development plans, techniques and

strategies for development of proprietary technology software, and other information not known

to the public.

12.     Mr. Mehmood's knowledge constitutes some of Plaintiff's most highly

confidential information that was acquired and developed over many years and at great expense

to Plaintiff. The value of the confidential information Mr. Mehmood had access to and obtained

4

is not strictly limited to Plaintiff's customers, but can be applied to contact center customers throughout the United States by any of Plaintiff's competitors.

### Noble's Wrongful Recruitment of Faisal Mehmood

13.    Noble is a direct competitor with Plaintiff. Specifically, Noble develops and markets technologies and products for use in contact centers.

14.    In 2012, Noble engaged in an intentional and systematic effort to eliminate its competitors from the market, acquire their intellectual property, and transition those competitors' clients to Noble's own technology products. For example, Noble acquired ALI Solutions ("ALI") and Stratasoft, Inc. ("Stratasoft") in September 2012 and it acquired TelStar Hosted Services ("TelStar") in October 2012. All of these companies competed directly with Noble in providing contact center technology.

15.    In addition to lawfully acquiring companies (and paying them for their confidential information), Noble engaged in a tortious, intentional, and systematic effort to obtain confidential information from Plaintiff.

16.    For example, before Noble acquired Stratasoft in September 2012, Stratasoft was wholly owned by TRG Holdings, LLC ("TRG"), the parent company of Plaintiff. Subsequent to the acquisition of Stratasoft, Noble filed a Demand for Arbitration against TRG for issues allegedly arising out its purchase of Stratasoft ("the Arbitration"). During the Arbitration, which is still pending, Noble admitted to intentionally and successfully accessing TRG's confidential information without authorization by recovering, reading, and using confidential and proprietary emails between TRG executives. These emails had been deleted by TRG prior to Noble's acquisition of Stratasoft in order to maintain the confidentiality of TRG's confidential and proprietary information.

17. Noble has engaged in similar tortious and wrongful actions to acquire Plaintiff's confidential information from Mr. Mehmood. Noble was introduced to Mr. Mehmood when, in connection with Noble's acquisition of Stratasoft, Mr. Mehmood was directed to interface with Noble. As a result of these interactions, Noble knew that Mr. Mehmood was a Software Consultant for Plaintiff. As a result of these interactions, Noble also knew that Mr. Mehmood had access to Plaintiff's confidential information.

18. Upon information and belief, subsequent to the acquisition of Stratasoft, Noble intentionally and successfully obtained Plaintiff's confidential information from Mr. Mehmood by inducing Mr. Mehmood to violate the industry-standard non-disclosure covenant in Mr. Mehmood's Services Agreements.

19. Subsequent to the acquisition of Stratasoft, Noble also intentionally and successfully recruited Mr. Mehmood to work as a Contract Developer at Noble, thereby inducing Mr. Mehmood to violate the industry-standard non-compete covenant in Mr. Mehmood's Services Agreements.

20. Upon information and belief, Noble knew that Mr. Mehmood's contractual relationship with Plaintiff included non-disclosure and non-compete covenants because such covenants are ubiquitous in the contact center technology development market. Upon information and belief, Noble also requires its employees to execute such agreements. Indeed, Noble even requires every person who simply attends its User Conference to sign such agreements. *See* Non-Disclosure Agreement for Noble Systems Corporation 2012 User Conference, available at

https://nobleusersgroup.noblesys.com/SNUG2012/pdf/SNUG2012_Sponsor_Confidentiality_Ag reement.pdf (last visited August 7, 2013), attached as Exhibit B.

6

21.     Noble engaged in its tortious and intentional actions to recruit Mr. Mehmood, and to thereby obtain Plaintiff's confidential information, before Mr. Mehmood's Services Agreement with Plaintiff had expired. On July 26, 2013, less than a week before the expiration of the second Services Agreement, Noble disclosed to TRG that it intended to use Mr. Mehmood as a witness in the Arbitration. In doing so, Plaintiff became aware, for the first time, that Noble had already engaged Mr. Mehmood as a Contract Developer.

22.     Noble purposefully directed its activities at District of Columbia residents. For example, by engaging with Plaintiff's parent company (TRG) during the Stratasoft acquisition, Noble knew that TRG's principal place of business was the District of Columbia. And Noble's introduction to Mr. Mehmood was directly related to, and substantially connected with, Noble's interactions with TRG in the District of Columbia. Indeed, as a direct result of this introduction, Noble learned that Mr. Mehmood had access to Plaintiff's confidential information and Noble then began targeting Mr. Mehmood to obtain access to that confidential information.

## FIRST CLAIM FOR RELIEF

### *(Tortious Interference with Contract)*

23.     Plaintiff repeats and re-alleges paragraphs 1 through 22, as if fully set forth herein.

24.     Plaintiff provides goods and services throughout the United States, including in the District of Columbia.

25.     Noble is engaged in a business similar to Plaintiff's business throughout the United States.

26.    Plaintiff took reasonable steps to safeguard its confidential information, including but not limited to requiring that its contractors sign a Services Agreement as a condition of the relationship.

27.    Plaintiff had a valid and enforceable contractual relationship with Mr. Mehmood, as memorialized in the Services Agreements.

28.    This contractual relationship included a valid and enforceable provision under which Mr. Mehmood and Plaintiff agreed that during the pendency of the contract and for the maximum period thereafter as permitted by law, Mr. Mehmood would not disclose to any person, or use, any confidential or proprietary information acquired by Mr. Mehmood by virtue of Mr. Mehmood's consulting relationship with Plaintiff.

29.    Plaintiff has not authorized Mr. Mehmood to disclose any of its confidential information to Noble or any representative of Noble.

30.    This contractual relationship also included a valid and enforceable provision under which Mr. Mehmood and Plaintiff agreed that during the pendency of the contract and for twelve months thereafter, Mr. Mehmood would not directly or indirectly engage in any business that is similar to Plaintiff's actual or prospective business.

31.    Upon information and belief, by virtue of Noble's extensive history in the contact center development market in which it employs numerous Contract Developers, Noble was aware of the contractual relationship between Plaintiff and Mr. Mehmood, including the industry-standard non-disclosure and non-compete covenants.

32.    Upon information and belief, Noble has maliciously, intentionally, and in bad faith, tortiously interfered with the contract between Plaintiff and Mr. Mehmood, and it continues to do so.

8

33. Upon information and belief, to gain a competitive advantage and to gain an advantage in the Arbitration with TRG, Noble intentionally and willfully interfered with the contractual relationship between Plaintiff and Mr. Mehmood by inducing Mr. Mehmood to breach the non-disclosure covenant in the Services Agreements. Mr. Mehmood did breach, and continues to breach, the Services Agreements by disclosing, and continuing to disclose, Plaintiff's confidential information to Noble.

34. To gain a competitive advantage and to gain an advantage in the Arbitration with TRG, Noble intentionally and willfully interfered with the contractual relationship between Plaintiff and Mr. Mehmood by inducing Mr. Mehmood to breach the non-compete covenant in the Services Agreements. Mr. Mehmood did breach the Services Agreements by agreeing to work as a Contract Developer for Noble prior to July 31, 2014.

35. Noble's tortious interference, and the resulting breach of Mr. Mehmood's Services Agreement, have caused, and will continue to cause, Plaintiff to suffer monetary damages.

36. Plaintiff respectfully requests monetary damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### *(Tortious Interference with Business Relationships)*

37. Plaintiff repeats and re-alleges paragraphs 1 through 36, as if fully set forth herein.

38. Plaintiff had a valid and enforceable contractual relationship with Mr. Mehmood, as memorialized in the Services Agreements.

9

39. Plaintiff reasonably expected to renew Mr. Mehmood's Services Agreement on or after August 1, 2013.

40. Upon information and belief, by virtue of Noble's long history in the contact center development market in which it employs numerous Contract Developers, Noble was aware of the contractual relationship between Plaintiff and Mr. Mehmood, including that Plaintiff reasonably expected to renew Mr. Mehmood's Services Agreement.

41. To gain a competitive advantage and to gain an advantage in the Arbitration with TRG, Noble intentionally and willfully interfered with Plaintiff's business relationship with Mr. Mehmood by inducing Mr. Mehmood to not renew the Services Agreement.

42. Upon information and belief, Noble has maliciously, intentionally, and in bad faith, tortiously interfered with Plaintiff's current and prospective business relationships, and it continues to do so.

43. Noble's tortious interference with Plaintiff's business relationships have caused, and will continue to cause, Plaintiff to suffer monetary damages.

44. Plaintiff respectfully requests monetary damages in an amount to be determined at trial.

## ADDITIONAL PRAYER FOR RELIEF

Plaintiff also respectfully requests that the Court award such other additional

relief, including attorney's fees and expenses, as is just and proper.

Dated: August 7, 2013                              Respectfully submitted,

                                                   WILLIAMS & CONNOLLY LLP

                                                   By: _____
                                                   J. Andrew Keyes (D.C. Bar No. 452377)
                                                   Carol J. Perry (D.C. Bar No. 1006941)
                                                   725 Twelfth Street, N.W.
                                                   Washington, D.C. 20005
                                                   (202) 434-5584
                                                   (202) 434-5029 (facsimile)
                                                   akeyes@wc.com

                                                   *Counsel for BPO Solutions, Inc.*

11

# EXHIBIT A

## Services Agreement

This Services Agreement ("Agreement") is made effective as of 1st July 2012 ("Effective Date") between BPO Solutions, Inc., a company organized under the laws of United States of America ("Company"), Faisal Mehmood, an individual residing at 195 D3, Wapda Town, Lahore, Pakistan. ("Contractor"). Company and Contractor may be generically referred to as a "Party" or collectively as the "Parties."

**WHEREAS,** Company seeks to engage Contractor perform certain services under the terms and conditions of this Agreement; and

**NOW THEREFORE,** in exchange for the mutual consideration and obligations set forth herein, the Parties agree as follows:

1. Services. Contractor will provide the following services (collectively, the "Services") as per the requirements of the Company:

    a. Development, engineering and maintenance of software

    b. Integration of and with current IT-enabled systems

    c. Designing and development of websites and graphics

    The Services shall also include providing reports and updates to the Company regarding any of the foregoing as requested.

2. Performance of Services. Contractor shall perform the Services in a prompt, professional, and workmanlike manner. Contractor shall work as many hours as reasonably necessary in order to perform the Services required by the Company. In providing the Services, Contractor may refer to itself as "Principal Software Consultant". Contractor's work coordinator shall be Rahim Lalani, who may from time to time delegate his supervisory authority to other individuals. Contractor shall follow all reasonable directions given by its work coordinator in performing the Services, but shall otherwise use its best judgment and discretion in performing the Services.

3. Standard of Conduct. In performing any Services, Contractor agrees to the following standard of conduct:

    a. Contractor shall not make any false, reckless, or negligent misstatements or representations concerning the Company, Contractor's relationship with the Company, or the Company's business in general;

    b. Contractor shall comply with all written policies of the Company in effect and shall follow all reasonable directions and service standards communicated by the Company to Contractor;

c. Except as approved by the Company in writing, Contractor shall not have any authority to enter into any contract or incur expenditure in the name of or for the account of the Company, nor hold itself out as having the authority to legally bind the Company; and

d. Contractor shall at all times comply with all applicable laws and regulations.

4. Expenses. The Company shall reimburse Contractor for any reasonable, out-of-pocket expenses it incurs in performing the Services, subject to Contractor submitting the receipts for such expenses to the Company and adherence to the Company's written policies governing such.

5. Compensation. In exchange for providing the Services, Contractor shall be compensated as follows (collectively, the "Fees"):

   a. Monthly Fee. Contractor shall earn a fee of USD 2,098 per month, pro-rated on a daily basis for any partial months.

   b. Other Fees. Contractor shall earn other fees, as and when applicable, as mutually agreed by the Parties.

   c. Invoicing and Payment. Contractor shall invoice Company in writing and in arrears for any Fees earned by Contractor. Such Fees shall be payable within 30 days from the date that the invoice is received by the Company.

6. Equipment. Contractor shall be solely responsible for arranging and maintaining at all times the necessary equipment required to provide services. The equipment should meet the following minimum specifications:

   a. 01 x laptop (Intel Core i7 processor, 500GB hard disk capacity, 8GB RAM, 15" display screen)
   b. 01 x headphones
   c. 01 x PC mouse
   d. 01 x smartphone with activated email services and unlimited data plan
   e. 01 x wireless internet connection (2 mbps or higher)

7. Subcontractors. Contractor shall not subcontract or otherwise assign its performance of any obligation under this Agreement without the Company's prior written approval.

8. Covenants. Contractor hereby agrees to all obligations in Schedule 1.

9. Term. The term of this Agreement shall commence on the Effective Date and shall continue for a period of four months, until 31st October 2012 inclusive (the "Term"). This Agreement may be amended to extend its duration, provided that both Company and Contractor sign and date the amendment.

10. Leaves. The Contractor shall be eligible for 9 days of paid sick/casual leave and 14 days of paid annual leave. The Company's written policy on the procedure of leave applications shall apply.

11. Termination. The Agreement will be terminated on the date specified in Section 9, unless an amendment is created to extend the duration of the Agreement. Company may terminate this Agreement at any time for Contractor's actual or anticipatory breach.

The Company shall have the right to terminate this Agreement at any time for convenience by providing Contractor with at least 30 days prior written notice thereof. Contractor shall have the right to terminate this Agreement at any time and for any reason by providing the Company with at least 30 days prior written notice thereof. In the event of a termination of this Agreement for any reason, the following shall apply:

    a. Contractor shall immediately cease providing any Services and shall not hold itself out as a Contractor of the Company, and shall not otherwise make any statements on the Company's behalf to any representative of Vanity Fair concerning the Company.

    b. Company shall pay Contractor for any Fees that were earned by Contractor up through the termination date in accordance with the terms of Section 5.

12. Agency. Contractor agrees that it is working as a non-exclusive contractor for the Company and not as an employee of the Company. Except as expressly provided in this Agreement or previously authorized by the Company in writing, Contractor shall have no authority to legally bind the Company in any manner.

13. Taxes and Insurance Coverage. Contractor agrees that it is solely responsible for all proper withholdings resulting from any compensation paid to it by the Company, including but not limited any and all income and payroll taxes. Contractor also agrees that it shall be solely responsible for maintaining any insurance policies and paying any payroll, governmental or other taxes that may be required by law.

14. Miscellaneous.

    a. Each Party represents and warrants that: (1) it is not subject to any agreement or understanding with any current or prior business (or any other entity or person) which would in any manner preclude its performance under this Agreement; (2) a duly-authorized representative of the Party has signed this Agreement and has authority to bind it to the obligations thereto; and (3) it will comply with all laws and regulations in performing under this Agreement.

    b. Contractor shall indemnify and hold harmless the Company and its affiliates, officers, directors, consultants, employees, and attorneys, against any claim, proceeding, or judgment arising out of a breach by Contractor of any provision of this Agreement, including any reasonable attorney fees and costs relating to such claim. Contractor agrees that the

Page 3 of 8

Confidential

Company may properly withhold any Fees that may be due to Contractor as an offset against Contractor's obligations to the Company.

c.  Each Party agrees that, expect for a breach of any obligation set forth in Schedule 1, no Party shall be liable to the other party for any consequential, special, or punitive damages, whether arising in contract, strict liability, or negligence. No Party limits its liability for death or bodily injury, or for any intentional misconduct or omissions.

d.  Any notice to be delivered under this Agreement must be sent to the following emails, delivery receipt requested, in order to be deemed a valid written notice under this Agreement. Such notices shall be deemed delivered: (i) as of the date of the delivery receipt; (ii) or, if no delivery receipt is given within 48 hours of sending the email, the date of the second business day after the date of sending:

If to Company:

Zartasha.Mumtaz@trgworld.com

If to Contractor:-

Faisal.Mehmood@stratasoft.com

e.  No waiver of any provision of this Agreement shall be effective by the Company unless set forth in a writing executed by the Company. Company may assign this agreement upon providing notice thereof to Contractor. All remedies set forth in this Agreement are cumulative to any other remedies a Party may have under applicable law. This Agreement constitutes the entire agreement between the Parties concerning the subject matter hereof. The Parties agree that all understandings, oral agreements, and representations made prior to the full execution of this Agreement are void and/or are superseded by this Agreement. This Agreement cannot be modified, changed, or amended, except in a writing signed by the Parties. All remedies set forth in this Agreement are cumulative to any other remedies a Party may have under applicable law. This Agreement may be executed in counterparts and delivered by electronic mail or facsimile. This Agreement shall be governed by the laws of Pakistan.

IN WITNESS HEREOF, the Parties have agreed to enter into this Agreement as of the Effective Date by affixing their signatures as set forth below:

BPO Solutions, Inc.

_____

Mohammed Khaishgi
Director

_____

Faisal Mehmood

Page 4 of 8

Confidential

## 1. Definitions

1.1     As used in this Schedule only, the "Company" includes BPO Solutions, Inc. and those entities controlling, controlled by, or under common control with, the Company, where "control" meaning that the controlling entity holds more than 50% of the voting securities or membership interests of the controlled entity.

1.2     "Confidential Information" means all information of any nature in any form, whether disclosed in writing, orally, or electronically, that is disclosed to or known by the Contractor as a consequence of or through its consulting relationship with the Company, whether such information is developed by Contractor or is submitted to the Company or its Affiliates in confidence by third parties.   Confidential Information will include, without limitation, all writings, memoranda, copies, reports, records, papers, surveys, analyses, drawings, letters, computer printouts, computer programs (source and object code), computer applications, computer processing techniques, methodologies, proposals, bids, processes, specifications, customer data (such as customer lists, identities, and requirements), contacts, licenses, business methods, business processes, business techniques, business plans, financial records, employee compensation, marketing plans, data, graphs, charts, sound recordings, pictorial representations, inventions, prototypes, and samples (whether or not patentable or copyrightable).  Confidential Information does not include information that was (i) part of the public domain at the time of disclosure to Contractor or becomes part of the public domain, other than by a Contractor's breach of an obligation to maintain confidentiality; (ii) acquired by Contractor from a third party without an obligation of confidentiality; or (iii) approved for public release in writing by the Company.

1.3     "Intellectual Property Rights" means all of the world-wide legal rights of, in and to the following: (i) patents, patent applications, and invention disclosures; (ii) copyrights and works of authorship, including without limitation textual, masks, audio/visual works, "look and feel," and derivative works; (iii) trademarks, service marks, trade names, and trade dress, together with all goodwill associated therewith; (iv) trade secrets, know-how, and proprietary and confidential information; (v) moral rights; (vi) design rights; (vii) domain names; (viii) any rights analogous to those set forth in the preceding clauses; and (ix) any applications, registrations, divisions, combinations, continuations, renewals, reissues, extensions, and translations of the foregoing (as applicable); whether existing on the Amendment Date or thereafter filed, issued, or acquired.

## 2. Confidentiality

2.1     Non-disclosure.  During the term of Contractor's consultancy with the Company, Company may disclose to the Contractor Confidential Information as appropriate or necessary for Contractor to perform its consulting duties, and Contractor will generate and contribute to Confidential Information in connection with Contractor's duties.  The Contractor hereby covenants and agrees that it will not, during the term of Contractor's consultancy with Company and for the maximum period thereafter as permitted by law, disclose to any person, or use, any Confidential Information except as required in the course of Contractor's consultancy with the Company or otherwise with Company's prior written consent.  Contractor shall use its best efforts to prevent accidental or negligent loss or release of Confidential Information to any unauthorized persons or entities and will immediately notify Company if any such loss or release occurs.

2.2     Return of company property. Immediately upon termination of Contractor's consultancy by for any reason, or upon Company's request, Contractor will return to the Company all property of the Company then in Contractor's possession or under Contractor's control and all property made available to Contractor in connection with the consultancy with Company. Contractor hereby waives any right it may have to keep any information private from the Company or its legal counsel that may be contained or embedded in any of the company property, including but not limited to any computer device or storage medium furnished to Contractor by the Company, and any non-Company email accounts.

2.3     Right of Inspection. For the purposes of verifying that Company's Confidential Information is not being misused or misappropriated, during the term of Contractor's retention and within 60 days after the termination of Contractor's consultancy for any reason, or in any litigation or arbitration involving or otherwise touching upon your consultancy with Company, Company may issue an "Inspection Notice" to Contractor requiring Contractor to deliver to Company: (1) all computer devices and electronic storage mediums that the Contractor owns or over which Contractor has control (and provide access codes and passwords) that Contractor has used in connection with his consultancy with Company; and (2) access codes and passwords to any personal email account or other personal electronic communication accounts or records that are controlled by Contractor, or that are maintained by a third party on Contractor's behalf, that Contractor has used in connection with his consultancy with Company. Upon receiving an Inspection Notice, Contractor shall have 5 days to comply with the notice or otherwise be deemed to be in breach of this Schedule. Contractor hereby consents to the Company's inspection of such computer devices, electronic storage mediums, and personal electronic communication accounts and waives any right they may have to keep private from the Company or their legal counsel any information that may reside on such devices, mediums, or accounts.

### 3. Works Made for Hire

3.1     Works Made for Hire. Contractor acknowledges and agrees that to the extent permitted by law, all work papers, reports, memoranda, research materials, documentation, drawings, photographs, negatives, tapes and masters, prototypes, contributions to a collective work, audio/visual works, translations, supplementary works, compilations, instructional texts, and all other copyrightable materials generated by Contractor during and in connection with Contractor's relationship with Company, including without limitation, any and all such materials generated and maintained on any form of electronic media (collectively, "Works") will be considered "works made for hire" and that authorship and ownership of any and all copyrights in any and all such works will belong solely to Company, including all aspects, elements, and components thereof in which any copyright can subsist and all rights to apply for copyright registration or to prosecute any claim of infringement of such Works.

3.2     Assignment of Works. To the extent that any Works are not deemed to be "works made for hire," Contractor hereby irrevocably transfers, grants, conveys, assigns, and relinquishes, all right, title, and interest in such Works, including all Intellectual Property Rights, to Company, its successors, assigns, or nominees for no further consideration.

### 4. Inventions

4.1     Assignment of Inventions. Contractor hereby transfers, grants, conveys, assigns, and relinquishes to the Company, or to those successors, assigns, or nominees that the Company may designate, all of Contractor's right, title, and interest (including all Intellectual Property Rights) in and to any

Confidential

ideas, discoveries, inventions, disclosures, and improvements (whether patentable or unpatentable) made, conceived, or suggested by Contractor in whole or in part, either solely or jointly with others, during the course of Contractor's relationship with Company or within one (1) year following termination of Contractor's relationship with Company, which were made with the use of Company's time, materials, or facilities or that is in any way within or related to the existing or the contemplated scope of the Company's business (collectively, the "Inventions"). To avoid ambiguity, any Inventions created by Contractor shall be automatically assigned to the Company, or to those successors, assigns, or nominees that the Company may designate, upon conception.

4.2 Duty of Disclosure. Contractor acknowledges and agrees to communicate promptly and disclose to Company, in such form and at such time as Company requests, all information, details, material, and data pertaining to any Inventions.

4.3 Duty to Cooperate. Upon request by Company, Contractor will, at any time during Contractor's consultancy with Company or after termination thereof, execute and deliver to Company all appropriate documents and perform all acts which Company may request in order to apply for, obtain, maintain, and prosecute any copyrights, trademarks, patents, or other Intellectual Property Rights in any Works or Inventions, or in order to perfect the assignments and transfer of rights in and to the Works or Inventions hereunder, at the expense of Company, but without further or additional consideration to Contractor.

4.4 Prior Intellectual Property Rights. Prior to or concurrent with Contractor's execution of the Agreement, Contractor agrees to provide Company with written notice of any actual ownership rights by Contractor (or rights assigned to a prior employer(s) or businesses) to all copyrights, ideas, discoveries, inventions, disclosures, and improvements (whether patentable or unpatentable) made, conceived, or suggested by Contractor in whole or in part, either solely or jointly with others, that: (i) exist as of the Contractor's the Effective Date; (ii) are not the subject of a existing patent, or pending or published patent application as of the Effective Date; and (iii) that are related to the business of Company ("Prior Intellectual Property Rights"). Contractor agrees that, other than the Prior Intellectual Property Rights set forth in such written notice, Contractor shall be deemed to have assigned pursuant to section 4.1, or to have incurred the obligation to assign pursuant to such section, to the Company, its successors, assigns, or nominees, all copyrights, ideas, discoveries, inventions, disclosures, and improvements (whether patentable or unpatentable) made, conceived, or suggested by Contractor in whole or in part, either solely or jointly with others, that are related to the business of the Company, unless Contractor demonstrates through written records and other evidence that such copyright, idea, discovery, invention, disclosure, or improvement made no use of any Confidential Information, time, materials, facilities, or other resources of Company.

## 5. Covenants

5.1 Non-Solicitation of Employees. Contractor agrees that during the Term of its consultancy and for a two-year period following termination of consultancy for any reason, Contractor will not, without the prior written consent of the Company, directly or indirectly (including without limitation as an individual, officer, director, proprietor, employee, partner, member, creditor, consultant, advisor, sales representative, agent, or investor of more than five percent (5%) of the issued equity of a corporate entity), solicit, request, cause, or encourage any employee or consultant of the Company, who was known to Contractor during his consultancy, to terminate their employment or consulting relationship with the Company.

Confidential

5.2 Non-Solicitation of Customers. Contractor agrees that during the Term of its consultancy and for a two year period following termination of such consultancy for any reason, Contractor will not, without the prior written consent of Company, directly or indirectly (including without limitation, through another entity in which the Contractor is a partner, director, officer, employee, consultant, advisor, or shareholder of more than 5% of the entity's outstanding equity) solicit, request, cause, or encourage any actual, past, or prospective customer of the Company, who was known to Contractor during its retention by Company, to modify, reduce, or terminate their actual or prospective customer relationships with Company, or to otherwise do business with any business engaged in offering services or products similar to, or competing with, the services or products offered by the Company.

5.3 Non-Compete. Contractor agrees that during the term of his consultancy, and for a twelve-month period following termination of such consultancy for any reason, Contractor will not directly or indirectly (including without limitation as an individual, officer, director, proprietor, employee, partner, member, creditor, consultant, advisor, sales representative, agent, or investor of more than five percent (5%) of the issued equity of a corporate entity), engage, anywhere in the Restricted Area (as defined below), in a Restricted Business (as defined below).

   5.3.1 "Restricted Area" means Pakistan and those geographic areas into which the Company provides goods or services.

   5.3.2 "Restricted Business" means any venture, enterprise, activity or business engaged in a business, directly or indirectly, similar to the actual or prospective business of Company, including without limitation, any business who provides in, to, or from the Restricted Area, dialer services, software or hardware.

5.4 Non-Disparagement: Contractor agrees that, during the term of its consultancy and up to the maximum extent allowed by law thereafter, Contractor shall not disparage or criticize the Company, nor any of their respective principals, directors, officers, or employees, including without limitation making any statements that are or could be harmful to the Company's goodwill with its customers, vendors, employees, the media or the public.

## 6. General

6.1 Severability. If any provision of this Exhibit is found to be invalid, illegal, or unenforceable, then, notwithstanding such provision, all other provisions of this Agreement will remain in full force or effect, and the terms of such provision will be limited to the extent necessary to render the provision valid, legal, and enforceable.

6.2 Injunctive Relief and Specific Performance. Contractor agrees that a breach of this Agreement result in irreparable and continuing harm to Company for which there is no adequate remedy at law. Contractor agrees that in the event of an actual, threatened, or intended breach of this Agreement by Contractor, Company will have the right to seek injunctive relief or specific performance in a court of law, and Contractor consents to the imposition of such relief, without the necessity of proof of actual damage, in order to prevent or restrain or restrain any such actual, threatened, or intended breach of this Agreement, and without the posting of any bond. Contractor agrees that injunctive relief and specific shall be cumulative to any other remedy that Company may seek for a breach of this Agreement, including compensatory and punitive damages.

Page 8 of 8

Confidential

## First Amendment to Services Agreement

This First Amendment to Service Agreement dated as of January 31st, 2013 ("**Effective Date**") is between BPO Solutions, Inc., a company organized under the laws of United States of America ("**Company**"), Faisal Mehmood, an individual residing at 195 D3, Wapda Town, Lahore, Pakistan ("**Contractor**"), and hereby amends the Service Agreement entered into between Company and Contractor dated as of 1st November 2012 ("**Agreement**").

**WHEREAS**, the Company entered into the Agreement in order to engage the Contractor to perform certain services; and

**WHEREAS**, the parties wish to amend certain sections of the Agreement in consideration for Employee's continued service; and

WHEREAS, the parties wish that the remaining terms of the Agreement remain the same.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual covenants herein contained, the parties agree to amend the Agreement as follows:

1. Article 5, Section 5 (a) shall be amended in its entirety to read as follows:

    a. Monthly Fee. Contractor shall earn a fee of USD 2,224 per month, pro-rated on a daily basis for any partial months. Such Fee may be subject to a revision as and when the Company deems appropriate and signed with mutual consent of both Parties.

2. Article 10 shall be amended in its entirety to read as follows:

    10. Leaves. The Contractor shall be eligible for 10 days of paid sick/casual leave and 28 days of paid annual leave. The Company's written policy on the procedure of leave applications shall apply.

3. Article 11 shall be amended in its entirety to read as follows:

    11. Termination. The Agreement will be terminated on the date specified in Section 9, unless an amendment is created to extend the duration of the Agreement. Company may terminate this Agreement at any time for Contractor's actual or anticipatory breach.

    The Company shall have the right to terminate this Agreement at any time for convenience by providing Contractor with at least 60 days prior written notice thereof. Contractor shall have the right to terminate this Agreement at any time and for any reason by providing the Company with at least 60 days prior written notice thereof. In the event of a termination of this Agreement for any reason, the following shall apply:

    a. Contractor shall immediately cease providing any Services and shall not hold itself out as a Contractor of the Company, and shall not otherwise make any

Confidential

statements on the Company's behalf to any representative of Vanity Fair concerning the Company.

b. Company shall pay Contractor for any Fees that were earned by Contractor up through the termination date in accordance with the terms of Section 5.

IN WITNESS HEREOF, the Parties hereto have executed this Amendment to the Agreement as of the Effective Date above by affixing their signatures as set forth below:

BPO Solutions, Inc.

Mohammed Khaishgi
Director

Faisal Mehmood

Page 2 of 2

Confidential

# Services Agreement

This Services Agreement ("**Agreement**") is made effective as of 1ˢᵗ November 2012 ("**Effective Date**") between BPO Solutions, Inc., a company organized under the laws of United States of America ("**Company**"), Faisal Mehmood, an individual residing at 195 D3, Wapda Town, Lahore, Pakistan. ("**Contractor**"). Company and Contractor may be generically referred to as a "**Party**" or collectively as the "**Parties**."

      **WHEREAS**, Company seeks to engage Contractor perform certain services under the terms and conditions of this Agreement; and

      **NOW THEREFORE**, in exchange for the mutual consideration and obligations set forth herein, the Parties agree as follows:

1. Services. Contractor will provide the following services (collectively, the "Services") as per the requirements of the Company:

    a. Development, engineering and maintenance of software

    b. Integration of and with current IT-enabled systems

    c. Designing and development of websites and graphics

    The Services shall also include providing reports and updates to the Company regarding any of the foregoing as requested.

2. Performance of Services. Contractor shall perform the Services in a prompt, professional, and workmanlike manner. Contractor shall work as many hours as reasonably necessary in order to perform the Services required by the Company. In providing the Services, Contractor may refer to itself as "Principal Software Consultant". Contractor's work coordinator shall be Rahim Lalani, who may from time to time delegate his supervisory authority to other individuals. Contractor shall follow all reasonable directions given by its work coordinator in performing the Services, but shall otherwise use its best judgment and discretion in performing the Services.

3. Standard of Conduct. In performing any Services, Contractor agrees to the following standard of conduct:

    a. Contractor shall not make any false, reckless, or negligent misstatements or representations concerning the Company, Contractor's relationship with the Company, or the Company's business in general;

    b. Contractor shall comply with all written policies of the Company in effect and shall follow all reasonable directions and service standards communicated by the Company to Contractor;

Page 1 of 8

Confidential

    c. Except as approved by the Company in writing, Contractor shall not have any authority to enter into any contract or incur expenditure in the name of or for the account of the Company, nor hold itself out as having the authority to legally bind the Company; and

    d. Contractor shall at all times comply with all applicable laws and regulations.

4. Expenses. The Company shall reimburse Contractor for any reasonable, out-of-pocket expenses it incurs in performing the Services, subject to Contractor submitting the receipts for such expenses to the Company and adherence to the Company's written policies governing such.

5. Compensation. In exchange for providing the Services, Contractor shall be compensated as follows (collectively, the "Fees"):

    a. Monthly Fee. Contractor shall earn a fee of USD 2,152 per month, pro-rated on a daily basis for any partial months. Such Fee may be subject to a revision as and when the Company deems appropriate and signed with mutual consent of both Parties.

    b. Other Fees. Contractor shall earn other fees, as and when applicable, as mutually agreed by the Parties.

    c. Invoicing and Payment. Contractor shall invoice Company in writing and in arrears for any Fees earned by Contractor. Such Fees shall be payable within 30 days from the date that the invoice is received by the Company.

6. Equipment. Contractor shall be solely responsible for arranging and maintaining at all times the necessary equipment required to provide services. The equipment should meet the following minimum specifications:
    a. 01 x laptop (Intel Core i7 processor, 500GB hard disk capacity, 8GB RAM, 15" display screen)
    b. 01 x headphones
    c. 01 x PC mouse
    d. 01 x smartphone with activated email services and unlimited data plan
    e. 01 x wireless internet connection (2 mbps or higher)

7. Subcontractors. Contractor shall not subcontract or otherwise assign its performance of any obligation under this Agreement without the Company's prior written approval.

8. Covenants. Contractor hereby agrees to all obligations in Schedule 1.

9. Term. The term of this Agreement shall commence on the Effective Date and shall continue for a period of nine months, until 31ˢᵗ July 2013 inclusive (the "Term"). This Agreement may be amended to extend its duration, provided that both Company and Contractor sign and date the amendment.

Confidential

10. Leaves. The Contractor shall be eligible for 9 days of paid sick/casual leave and 14 days of paid annual leave. The Company's written policy on the procedure of leave applications shall apply.

11. Termination. The Agreement will be terminated on the date specified in Section 9, unless an amendment is created to extend the duration of the Agreement. Company may terminate this Agreement at any time for Contractor's actual or anticipatory breach.

The Company shall have the right to terminate this Agreement at any time for convenience by providing Contractor with at least 30 days prior written notice thereof. Contractor shall have the right to terminate this Agreement at any time and for any reason by providing the Company with at least 30 days prior written notice thereof. In the event of a termination of this Agreement for any reason, the following shall apply:

   a. Contractor shall immediately cease providing any Services and shall not hold itself out as a Contractor of the Company, and shall not otherwise make any statements on the Company's behalf to any representative of Vanity Fair concerning the Company.

   b. Company shall pay Contractor for any Fees that were earned by Contractor up through the termination date in accordance with the terms of Section 5.

12. Agency. Contractor agrees that it is working as a non-exclusive contractor for the Company and not as an employee of the Company. Except as expressly provided in this Agreement or previously authorized by the Company in writing, Contractor shall have no authority to legally bind the Company in any manner.

13. Taxes and Insurance Coverage. Contractor agrees that it is solely responsible for all proper withholdings resulting from any compensation paid to it by the Company, including but not limited any and all income and payroll taxes. Contractor also agrees that it shall be solely responsible for maintaining any insurance policies and paying any payroll, governmental or other taxes that may be required by law.

14. Miscellaneous.

   a. Each Party represents and warrants that: (1) it is not subject to any agreement or understanding with any current or prior business (or any other entity or person) which would in any manner preclude its performance under this Agreement; (2) a duly-authorized representative of the Party has signed this Agreement and has authority to bind it to the obligations thereto; and (3) it will comply with all laws and regulations in performing under this Agreement.

   b. Contractor shall indemnify and hold harmless the Company and its affiliates, officers, directors, consultants, employees, and attorneys, against any claim, proceeding, or judgment arising out of a breach by Contractor of any provision of this Agreement, including any reasonable attorney fees and costs relating to such claim. Contractor agrees that the

Page 3 of 8

Confidential

Company may properly withhold any Fees that may be due to Contractor as an offset against Contractor's obligations to the Company.

c. Each Party agrees that, expect for a breach of any obligation set forth in Schedule 1, no Party shall be liable to the other party for any consequential, special, or punitive damages, whether arising in contract, strict liability, or negligence. No Party limits its liability for death or bodily injury, or for any intentional misconduct or omissions.

d. Any notice to be delivered under this Agreement must be sent to the following emails, delivery receipt requested, in order to be deemed a valid written notice under this Agreement. Such notices shall be deemed delivered: (i) as of the date of the delivery receipt; (ii) or, if no delivery receipt is given within 48 hours of sending the email, the date of the second business day after the date of sending:

If to Company:

Zartasha.Mumtaz@trgworld.com

If to Contractor:

Faisal.Mehmood@trgworld.com

e. No waiver of any provision of this Agreement shall be effective by the Company unless set forth in a writing executed by the Company. Company may assign this agreement upon providing notice thereof to Contractor. All remedies set forth in this Agreement are cumulative to any other remedies a Party may have under applicable law. This Agreement constitutes the entire agreement between the Parties concerning the subject matter hereof. The Parties agree that all understandings, oral agreements, and representations made prior to the full execution of this Agreement are void and/or are superseded by this Agreement. This Agreement cannot be modified, changed, or amended, except in a writing signed by the Parties. All remedies set forth in this Agreement are cumulative to any other remedies a Party may have under applicable law. This Agreement may be executed in counterparts and delivered by electronic mail or facsimile. This Agreement shall be governed by the laws of Pakistan.

IN WITNESS HEREOF, the Parties have agreed to enter into this Agreement as of the Effective Date by affixing their signatures as set forth below:

BPO Solutions, Inc.

Mohammed Khalhgi
Director

Faisal Mehmood

Page 4 of 8

Confidential

## 1. Definitions

1.1    As used in this Schedule only, the "Company" includes BPO Solutions, Inc. and those entities controlling, controlled by, or under common control with, the Company, where "control" meaning that the controlling entity holds more than 50% of the voting securities or membership interests of the controlled entity.

1.2    "Confidential Information" means all information of any nature in any form, whether disclosed in writing, orally, or electronically, that is disclosed to or known by the Contractor as a consequence of or through its consulting relationship with the Company, whether such information is developed by Contractor or is submitted to the Company or its Affiliates in confidence by third parties. Confidential Information will include, without limitation, all writings, memoranda, copies, reports, records, papers, surveys, analyses, drawings, letters, computer printouts, computer programs (source and object code), computer applications, computer processing techniques, methodologies, proposals, bids, processes, specifications, customer data (such as customer lists, identities, and requirements), contacts, licenses, business methods, business processes, business techniques, business plans, financial records, employee compensation, marketing plans, data, graphs, charts, sound recordings, pictorial representations, inventions, prototypes, and samples (whether or not patentable or copyrightable). Confidential Information does not include information that was (i) part of the public domain at the time of disclosure to Contractor or becomes part of the public domain, other than by a Contractor's breach of an obligation to maintain confidentiality; (ii) acquired by Contractor from a third party without an obligation of confidentiality; or (iii) approved for public release in writing by the Company.

1.3    "Intellectual Property Rights" means all of the world-wide legal rights of, in and to the following: (i) patents, patent applications, and invention disclosures; (ii) copyrights and works of authorship, including without limitation textual, masks, audio/visual works, "look and feel," and derivative works; (iii) trademarks, service marks, trade names, and trade dress, together with all goodwill associated therewith; (iv) trade secrets, know-how, and proprietary and confidential information; (v) moral rights; (vi) design rights; (vii) domain names; (viii) any rights analogous to those set forth in the preceding clauses; and (ix) any applications, registrations, divisions, combinations, continuations, renewals, reissues, extensions, and translations of the foregoing (as applicable); whether existing on the Amendment Date or thereafter filed, issued, or acquired.

## 2. Confidentiality

2.1    Non-disclosure. During the term of Contractor's consultancy with the Company, Company may disclose to the Contractor Confidential Information as appropriate or necessary for Contractor to perform its consulting duties, and Contractor will generate and contribute to Confidential Information in connection with Contractor's duties. The Contractor hereby covenants and agrees that it will not, during the term of Contractor's consultancy with Company and for the maximum period thereafter as permitted by law, disclose to any person, or use, any Confidential Information except as required in the course of Contractor's consultancy with the Company or otherwise with Company's prior written consent. Contractor shall use its best efforts to prevent accidental or negligent loss or release of Confidential Information to any unauthorized persons or entities and will immediately notify Company if any such loss or release occurs.

Confidential

2.2     Return of company property. Immediately upon termination of Contractor's consultancy by for any reason, or upon Company's request, Contractor will return to the Company all property of the Company then in Contractor's possession or under Contractor's control and all property made available to Contractor in connection with the consultancy with Company. Contractor hereby waives any right it may have to keep any information private from the Company or its legal counsel that may be contained or embedded in any of the company property, including but not limited to any computer device or storage medium furnished to Contractor by the Company, and any non-Company email accounts.

2.3     Right of Inspection. For the purposes of verifying that Company's Confidential Information is not being misused or misappropriated, during the term of Contractor's retention and within 60 days after the termination of Contractor's consultancy for any reason, or in any litigation or arbitration involving or otherwise touching upon your consultancy with Company, Company may issue an "Inspection Notice" to Contractor requiring Contractor to deliver to Company: (1) all computer devices and electronic storage mediums that the Contractor owns or over which Contractor has control (and provide access codes and passwords) that Contractor has used in connection with his consultancy with Company; and (2) access codes and passwords to any personal email account or other personal electronic communication accounts or records that are controlled by Contractor, or that are maintained by a third party on Contractor's behalf, that Contractor has used in connection with his consultancy with Company. Upon receiving an Inspection Notice, Contractor shall have 5 days to comply with the notice or otherwise be deemed to be in breach of this Schedule. Contractor hereby consents to the Company's inspection of such computer devices, electronic storage mediums, and personal electronic communication accounts and waives any right they may have to keep private from the Company or their legal counsel any information that may reside on such devices, mediums, or accounts.

### 3. Works Made for Hire

3.1     Works Made for Hire. Contractor acknowledges and agrees that to the extent permitted by law, all work papers, reports, memoranda, research materials, documentation, drawings, photographs, negatives, tapes and masters, prototypes, contributions to a collective work, audio/visual works, translations, supplementary works, compilations, instructional texts, and all other copyrightable materials generated by Contractor during and in connection with Contractor's relationship with Company, including without limitation, any and all such materials generated and maintained on any form of electronic media (collectively, "Works") will be considered "works made for hire" and that authorship and ownership of any and all copyrights in any and all such works will belong solely to Company, including all aspects, elements, and components thereof in which any copyright can subsist and all rights to apply for copyright registration or to prosecute any claim of infringement of such Works.

3.2     Assignment of Works. To the extent that any Works are not deemed to be "works made for hire," Contractor hereby irrevocably transfers, grants, conveys, assigns, and relinquishes, all right, title, and interest in such Works, including all Intellectual Property Rights, to Company, its successors, assigns, or nominees for no further consideration.

### 4. Inventions

4.1     Assignment of Inventions. Contractor hereby transfers, grants, conveys, assigns, and relinquishes to the Company, or to those successors, assigns, or nominees that the Company may designate, all of Contractor's right, title, and interest (including all Intellectual Property Rights) in and to any

Page 6 of 8

Confidential

ideas, discoveries, inventions, disclosures, and improvements (whether patentable or unpatentable) made, conceived, or suggested by Contractor in whole or in part, either solely or jointly with others, during the course of Contractor's relationship with Company or within one (1) year following termination of Contractor's relationship with Company, which were made with the use of Company's time, materials, or facilities or that is in any way within or related to the existing or the contemplated scope of the Company's business (collectively, the "Inventions"). To avoid ambiguity, any Inventions created by Contractor shall be automatically assigned to the Company, or to those successors, assigns, or nominees that the Company may designate, upon conception.

4.2    Duty of Disclosure. Contractor acknowledges and agrees to communicate promptly and disclose to Company, in such form and at such time as Company requests, all information, details, material, and data pertaining to any Inventions.

4.3    Duty to Cooperate. Upon request by Company, Contractor will, at any time during Contractor's consultancy with Company or after termination thereof, execute and deliver to Company all appropriate documents and perform all acts which Company may request in order to apply for, obtain, maintain, and prosecute any copyrights, trademarks, patents, or other Intellectual Property Rights in any Works or Inventions, or in order to perfect the assignments and transfer of rights in and to the Works or Inventions hereunder, at the expense of Company, but without further or additional consideration to Contractor.

4.4    Prior Intellectual Property Rights. Prior to or concurrent with Contractor's execution of the Agreement, Contractor agrees to provide Company with written notice of any actual ownership rights by Contractor (or rights assigned to a prior employer(s) or businesses) to all copyrights, ideas, discoveries, inventions, disclosures, and improvements (whether patentable or unpatentable) made, conceived, or suggested by Contractor in whole or in part, either solely or jointly with others, that: (i) exist as of the Contractor's the Effective Date; (ii) are not the subject of a existing patent, or pending or published patent application as of the Effective Date; and (iii) that are related to the business of Company ("Prior Intellectual Property Rights"). Contractor agrees that, other than the Prior Intellectual Property Rights set forth in such written notice, Contractor shall be deemed to have assigned pursuant to section 4.1, or to have incurred the obligation to assign pursuant to such section, to the Company, its successors, assigns, or nominees, all copyrights, ideas, discoveries, inventions, disclosures, and improvements (whether patentable or unpatentable) made, conceived, or suggested by Contractor in whole or in part, either solely or jointly with others, that are related to the business of the Company, unless Contractor demonstrates through written records and other evidence that such copyright, idea, discovery, invention, disclosure, or improvement made no use of any Confidential Information, time, materials, facilities, or other resources of Company.

## 5. Covenants

5.1    Non-Solicitation of Employees. Contractor agrees that during the Term of its consultancy and for a two-year period following termination of consultancy for any reason, Contractor will not, without the prior written consent of the Company, directly or indirectly (including without limitation as an individual, officer, director, proprietor, employee, partner, member, creditor, consultant, advisor, sales representative, agent, or investor of more than five percent (5%) of the issued equity of a corporate entity), solicit, request, cause, or encourage any employee or consultant of the Company, who was known to Contractor during his consultancy, to terminate their employment or consulting relationship with the Company.

Page 7 of 8

Confidential

5.2   Non-Solicitation of Customers.  Contractor agrees that during the Term of its consultancy and for a two year period following termination of such consultancy for any reason, Contractor will not, without the prior written consent of Company, directly or indirectly (including without limitation, through another entity in which the Contractor is a partner, director, officer, employee, consultant, advisor, or shareholder of more than 5% of the entity's outstanding equity) solicit, request, cause, or encourage any actual, past, or prospective customer of the Company, who was known to Contractor during its retention by Company, to modify, reduce, or terminate their actual or prospective customer relationships with Company, or to otherwise do business with any business engaged in offering services or products similar to, or competing with, the services or products offered by the Company.

5.3   Non-Compete.  Contractor agrees that during the term of his consultancy, and for a twelve-month period following termination of such consultancy for any reason, Contractor will not directly or indirectly (including without limitation as an individual, officer, director, proprietor, employee, partner, member, creditor, consultant, advisor, sales representative, agent, or investor of more than five percent (5%) of the issued equity of a corporate entity), engage, anywhere in the Restricted Area (as defined below), in a Restricted Business (as defined below).

     5.3.1   "Restricted Area" means Pakistan and those geographic areas into which the Company provides goods or services.

     5.3.2   "Restricted Business" means any venture, enterprise, activity or business engaged in a business, directly or indirectly, similar to the actual or prospective business of Company, including without limitation, any business who provides in, to, or from the Restricted Area, dialer services, software or hardware.

5.4   Non-Disparagement:  Contractor agrees that, during the term of its consultancy and up to the maximum extent allowed by law thereafter, Contractor shall not disparage or criticize the Company, nor any of their respective principals, directors, officers, or employees, including without limitation making any statements that are or could be harmful to the Company's goodwill with its customers, vendors, employees, the media or the public.

## 6. General

6.1   Severability.  If any provision of this Exhibit is found to be invalid, illegal, or unenforceable, then, notwithstanding such provision, all other provisions of this Agreement will remain in full force or effect, and the terms of such provision will be limited to the extent necessary to render the provision valid, legal, and enforceable.

6.2   Injunctive Relief and Specific Performance.  Contractor agrees that a breach of this Agreement result in irreparable and continuing harm to Company for which there is no adequate remedy at law.  Contractor agrees that in the event of an actual, threatened, or intended breach of this Agreement by Contractor, Company will have the right to seek injunctive relief or specific performance in a court of law, and Contractor consents to the imposition of such relief, without the necessity of proof of actual damage, in order to prevent or restrain or restrain any such actual, threatened, or intended breach of this Agreement, and without the posting of any bond.  Contractor agrees that injunctive relief and specific shall be cumulative to any other remedy that Company may seek for a breach of this Agreement, including compensatory and punitive damages.

Page 8 of 8

Confidential

# EXHIBIT B

## NON-DISCLOSURE AGREEMENT FOR NOBLE SYSTEMS CORPORATION 2012 USER CONFERENCE

This Non-Disclosure Agreement for Noble Systems Corporation 2012 User Conference (the "Agreement") is by and between Noble Systems Corporation, a Georgia corporation with a principal place of business at 4151 Ashford Dunwoody Road, Suite 600, Atlanta, Georgia 30319 ("NSC") and the SPONSOR (as further identified by its execution below). This Agreement shall be effective as of the date of execution by SPONSOR.

In consideration of the mutual promises and covenants set forth below, NSC's disclosure of its Confidential Information (as defined in Section 1 below) to SPONSOR during the NSC User Conference, and any payment made or to be made by NSC or SPONSOR, the parties hereto agree as follows:

1. **Confidential Information.** For purposes of this Agreement, "Confidential Information" means any information, in any form, that is disclosed by NSC or its agents or representatives to SPONSOR or discerned by SPONSOR at or during the "Select Noble Users Group Conference" held on May 1 – 3, 2012 in Atlanta, Georiga (the "Conference") or based on such disclosures that consists of (i) information relating to released or unreleased NSC software products and the specifications, capabilities or functionality thereof, the marketing or promotion of any NSC software products, NSC's business policies or practices, or the distinctive methods or procedures that NSC uses in the design, development, licensing, support, or maintenence of its products, and all documentation related thereto, and (ii) any other information that NSC designates as being confidential or that, under the circumstances surrounding disclosure, ought to be treated as confidential. "Confidential Information" shall also include all such information identified above, whether owned by NSC or any of its affiliates, subsidiaries or suppliers and all embodiments thereof, tangible and intangible, including, without limitation, oral disclosures, visual presentations, forms, handwritten notes, written or printed documents and computer disks or tapes, whether machine or user readable.

The Confidential Information shall not include information that, as evidenced by documentary evidence: (i) is or becomes a part of the public domain through no act or omission of SPONSOR; (ii) is lawfully disclosed to SPONSOR by a third party without an obligation of nondisclosure to NSC or its affiliates, subsidiaries or suppliers; (iii) is independently developed by SPONSOR without reference to the Confidential Information; or (iv) was in SPONSOR's possession prior to such disclosure hereunder without obligation of confidentiality.

2. **Restrictions.** SPONSOR shall not disclose any Confidential Information to any third parties during the following periods: (i) for Confidential Information consisting of trade secrets, for so long as such information constitutes a trade secret or a period of seven (7) years following the date of its disclosure by NSC to SPONSOR hereunder, or (ii) for all other Confidential Information, a period of seven (7) years following the date of its disclosure by NSC to SPONSOR hereunder. However, SPONSOR may disclose Confidential Information in accordance with judicial or other governmental order and only to the extent requested by such order, provided SPONSOR gives NSC reasonable notice prior to such disclosure and complies with any applicable protective order or equivalent

SPONSOR shall take commercially reasonable security precautions, at least as great as the precautions SPONSOR (or its employer) takes to protect its Confidential Information, to keep confidential the Confidential Information and prevent any unauthorized disclosures thereof. Confidential Information may be disclosed, reproduced, summarized or distributed only in pursuance of SPONSOR' business relationship with NSC, and only as otherwise provided hereunder. SPONSOR may disclose Confidential Information only to SPONSOR's employees or third parties working solely on its behalf on a need-to-know basis, so long as SPONSOR has written agreements with its employees and such third parties sufficient to enable it to comply with all the provisions of this Agreement.   SPONSOR shall be responsible for such employees' and third parties' compliance with the terms of this Agreement.

SPONSOR may not reverse engineer, decompile or disassemble any NSC software disclosed to SPONSOR.

3. **Rights and Remedies.** SPONSOR shall notify NSC immediately upon discovery of any unauthorized use or disclosure of Confidential Information or any

other breach of this Agreement by SPONSOR and will cooperate with NSC in every reasonable way to help NSC regain possession of the Confidential Information and prevent its further unauthorized use.    SPONSOR shall promptly return to NSC all originals, copies, reproductions and summaries of Confidential Information at NSC's request or, at NSC's option, certify destruction of the same.

SPONSOR acknowledges that monetary damages may not be a sufficient remedy for unauthorized disclosure of Confidential Information and that NSC shall be entitled, without waiving any other rights or remedies, to seek such injunction or equitable relief as may be deemed proper by a court of competent jurisdiction.

4. **Miscellaneous.** All Confidential Information is and shall remain the property of NSC or is applicable affiliate, subsidiary or supplier.  NSC does not grant any express or implied right to SPONSOR to or under any NSC patents, copyrights, trademarks, trade secret information or any other information or materials owned, controlled or licensed to NSC, and no licenses or rights to use any NSC software products are granted in this Agreement.

SPONSOR agrees that it will not, directly or indirectly, export or re-export any Confidential Information or any product (or any part thereof) that is the direct product of the Confidential Information to any country that is subject to U.S. export restrictions or to any national of any such country, wherever located, who intends to transmit or transport the products back to such country.

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and merges all prior discussions between them as Confidential Information.  It shall not be modified except by a written agreement dated subsequent to the date of this Agreement and signed by both parties.  None of the provisions of this Agreement shall be deemed to have been waived by any act or acquiescence on the part of NSC, its agents or employees, but only by an instrument in writing signed by an authorized officer of NSC.  No waiver of any provision of this Agreement shall constitute a waiver of any other provision(s) or of the same provision on another occasion. Subject to the limitations set forth herein, this Agreement will inure to the benefit of and be binding upon the parties, their successors and assigns.  If any provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect. All obligations created by this Agreement shall survive change or termination of the parties' business relationship.

This Agreement shall be construed and controlled by the laws of the State of Georgia, without regard for its conflicts of law principals.  SPONSOR consents to the jurisdiction by and venue in the state and federal courts having jurisdiction over NSC's principal place of business in Atlanta, Georgia.

5. **Suggestions and Feedback.** Any suggestions, feedback or other disclosures regarding the Confidential Information made by SPONSOR in response to any NSC requests are and shall be entirely voluntary on SPONSOR's part and shall not create any obligations on the part of NSC or a confidential relationship between SPONSOR and NSC.  All such feedback provided by SPONSOR shall be owned by NSC.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

"SPONSOR"

By:

Name:

Title:

Address:

Date:



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Telephone: (202) 879-1133**

BPO Solutions, Inc.
_____
                          Plaintiff

**13-0005424**

vs.                                    Case Number _____

Noble Systems Corporation
_____
                          Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

J. Andrew Keyes
_____
Name of Plaintiff's Attorney

725 Twelfth St., N.W.
_____
Address
Washington, D.C. 20005
_____

(202) 434-5584
_____
Telephone

*Clerk of the Court*

By ___Adrienne J. Marsh___
                 Deputy Clerk

Date ___8 | 7 | 2013___

如需翻译,请打电话 (202) 879-4828   Veuillez appeler au (202) 879-4828 pour une traduction   Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
                                    Demandante

        contra

                                                        Número de Caso: _____

_____
                                    Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                        Por: _____

_____
Dirección                                                    Subsecretario

                                        Fecha _____

_____
Teléfono
如果需要翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bản dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

BPO SOLUTIONS, INC
    Vs.                             C.A. No.      2013 CA 005424 B
NOBLE SYSTEMS CORPORATION

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to:  Judge THOMAS J MOTLEY
Date:  August 7, 2013
Initial Conference: 9:30 am, Friday, November 08, 2013
Location:  Courtroom 212
            500 Indiana Avenue N.W.
            WASHINGTON, DC 20001                              Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case, are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Filed
D.C. Superior Court
08/14/2013 15:57PM
Clerk of the Court

Form CA 1-A: Notice and Acknowledgment for Service by Mail



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

BPO Solutions, Inc.
_____
*Plaintiff(s)*

v.                                                    Case No: 13-0005424

Noble Systems Corporation
_____
*Defendant(s)*

## NOTICE

To (insert name and address of the party to be served):

Noble Systems Corporation
4151 Ashford Dunwoody Rd. NE
Atlanta, GA 30319
_____

The enclosed summons, complaint and initial order are served pursuant to Rule 4(c)(4) of the Superior Court Rules of Civil Procedure.

You must sign and date the Acknowledgement (below). If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate next to your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate next to your signature your authority.

If you do not complete and return the form to the sender within twenty (20) days after it has been mailed, you (or the other party on whose behalf you are being served) may be required to pay any expenses incurred in serving a summons, complaint and initial order in any other manner permitted by law.

If you do complete and return this form, you (or the other party on whose behalf you are being served) must answer the complaint within twenty (20) days after you have signed, dated and returned the form. If you fail to do so, judgment by default may be entered against you for the relief demanded in the complaint.

This Notice and Acknowledgment of Receipt of Summons, Complaint and Initial Order was mailed on (insert date): 8/12/2013 .

_____                    _8/12/13_____
Signature                                      Date of Signature

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS, COMPLAINT, AND INITIAL ORDER

I (print name) Jeremy Littlefield    received a copy of the summons, complaint and initial order in the above captioned matter at (insert address): Robbins Firm
999 Peachtree St. NE, Suite 1120
Atlanta, GA 30309

_____    Attorney for Defendant   8/13/13
Signature                    Relationship to Defendant/Authority   Date of Signature
                             to Receive Service

Para pedir una traducción, llame al (202) 879-4828        如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bài dịch, hãy gọi (202) 879-4828        የትርጉም ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ        번역을 원하시면, (202) 879-4828 로 전화주십시오

**Filed**
**D.C. Superior Court**
**08/26/2013 11:36AM**
**Clerk of the Court**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | | |
|---|---|---|
| BPO SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.      2013 CA 005424 B |
| v. | ) | |
| | ) | |
| NOBLE SYSTEMS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

### PRAECIPE OF APPEARANCE

**To the Clerk of this Court and all parties of record:**

Please enter the appearance of the following counsel for Defendant Noble Systems

Corporation in the above-captioned case:

> **Tillman Finley (D.C. Bar No. 477737)**
> Email:  tfinley@marinolawpllc.com
> MARINO LAW PLLC
> 910 17th Street, N.W. Suite 800
> Washington, DC  20006
> (202) 223-8888 (telephone)
> (877) 239-2146 (facsimile)

Dated:  August 26, 2013                    Respectfully submitted,


By:     /s/Tillman J. Finley
        Tillman Finley (D.C. Bar No. 477737)
        Email:  tfinley@marinolawpllc.com
        MARINO LAW PLLC
        910 17th Street, N.W. Suite 800
        Washington, DC  20006
        (202) 223-8888 (telephone)
        (877) 239-2146 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that, on August 26, 2013, I caused a copy of the foregoing Praecipe of

Appearance was served on the following via the Court's electronic filing system:

> J. Andrew Keyes
> Carol J. Perry
> 725 Twelfth Street, NW
> Washington, DC  20005
> (202) 434-5584
> (202) 434-5029 (facsimile)
>
> Email:  akeyes@wc.com
>
> *Counsel for Plaintiff BPO Solutions, Inc.*

/s/Tillman J. Finley
Tillman Finley

**Filed**
**D.C. Superior Court**
**08/28/2013 10:45AM**
**Clerk of the Court**

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | | |
|---|---|---|
| BPO SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.      2013 CA 005424 B |
| v. | ) | |
| | ) | |
| NOBLE SYSTEMS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

### PRAECIPE TO EXTEND TIME

**To the Clerk of this Court and all parties of record:**

Pursuant to Superior Court Rule 55(a)(2), the parties hereby stipulate to a one-time extension of twenty (20) days for Defendant to plead or otherwise respond.

Dated:  August 28, 2013                          Respectfully submitted,

By:      /s/Tillman J. Finley
          Tillman Finley (D.C. Bar No. 477737)
          Email:  tfinley@marinolawpllc.com
          MARINO LAW PLLC
          910 17th Street, N.W. Suite 800
          Washington, DC  20006
          (202) 223-8888 (telephone)
          (877) 239-2146 (facsimile)

          *Counsel for Defendant Noble Systems Corp.*

          /s/J. Andrew Keyes (by permission)
          J. Andrew Keyes (D.C. Bar No. 452377)
          Email:  akeyes@wc.com
          WILLIAMS & CONNOLLY LLP
          725 Twelfth Street, NW
          Washington, DC  20005
          (202) 434-5584
          (202) 434-5029 (facsimile)

          *Counsel for Plaintiff BPO Solutions, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 28, 2013, I caused a copy of the foregoing Praecipe to

Extend Time was served on the following via the Court's electronic filing system:

> J. Andrew Keyes
> Carol J. Perry
> WILLIAMS & CONNOLLY LLP
> 725 Twelfth Street, NW
> Washington, DC  20005
> (202) 434-5584
> (202) 434-5029 (facsimile)
>
> Email:  akeyes@wc.com
>
> *Counsel for Plaintiff BPO Solutions, Inc.*

> /s/Tillman J. Finley
> Tillman Finley

2